# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Barbara Shepard

    v.                          Civil No. 11-cv-65-JL

Latva Machine, Inc.

## REPORT AND RECOMMENDATION

Before the court is pro se plaintiff Barbara Shepard's complaint (doc. no. 1), alleging violations of her rights under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 ("ADEA").  The matter is before the court for a preliminary review to determine, among other things, whether the pleadings, filed in forma pauperis, state any claim upon which relief might be granted.  See 28 U.S.C. § 1915(e)(2)(B); United States District Court District of New Hampshire Local Rule ("LR") 4.3(d)(1)(B) (magistrate judge directed to perform preliminary review of complaints filed in forma pauperis).

## Standard of Review

Under this court's local rules, when a plaintiff commences an action pro se and in forma pauperis, the magistrate judge conducts a preliminary review.  LR 4.3(d)(1).  The magistrate judge may issue a report and recommendation after the initial

review, recommending that claims be dismissed if the court lacks subject matter jurisdiction, the defendant is immune from the relief sought, the complaint fails to state a claim upon which relief may be granted, the allegation of poverty is untrue, or the action is frivolous or malicious.  See id. (citing 28 U.S.C. § 1915(e)(2) & Fed. R. Civ. P. 12(b)(1)).

    To determine if a pro se complaint states any claim upon which relief could be granted, the court liberally construes the pleadings, see Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam); Castro v. United States, 540 U.S. 375, 381 (2003), and then applies a standard analogous to that used in reviewing a motion to dismiss filed under Fed. R. Civ. P. 12(b)(6).  The court decides whether the complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  See Ashcroft v. Iqbal, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009).

    To make this determination, the court employs a two-pronged approach.  See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  The court first screens the complaint for statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action."  Id. (citations, internal quotation marks and alterations

omitted).  A claim consisting of little more than "allegations that merely parrot the elements of the cause of action" may be dismissed.  Id.  The second part of the test requires the court to credit as true all non-conclusory factual allegations and the reasonable inferences drawn from those allegations, and then to determine if the claim is plausible.  Id.  The plausibility requirement "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of illegal conduct.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007). The "make-or-break standard" is that those allegations and inferences, taken as true, "must state a plausible, not a merely conceivable, case for relief."  Sepúlveda-Villarini v. Dep't of Educ., 628 F.3d 25, 29 (1st Cir. 2010); see Twombly, 550 U.S. at 555-56 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." (citations and footnote omitted)).

Evaluating the plausibility of a claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 129 S. Ct. at 1950 (citation omitted).  In doing so, the court may not disregard properly pleaded factual allegations or "attempt to

forecast a plaintiff's likelihood of success on the merits."
Ocasio-Hernández, 640 F.3d at 13. "The relevant inquiry focuses
on the reasonableness of the inference of liability that the
plaintiff is asking the court to draw from the facts alleged in
the complaint." Id.

## Background

Attached to the complaint in this case is a report on
plaintiff's ADEA claims, prepared in August 2010 by a New
Hampshire Human Rights Commission ("NHHRC") investigator
assigned to review Shepard's employment discrimination charges.
The factual allegations in the complaint, including the
undisputed facts stated in the investigator's report, need not
be repeated here, as they are clearly stated therein. A summary
of the factual allegations in the complaint, including the
report, is set forth below to provide a context for the claims
asserted here.[1]

---

[1]The undisputed contents of documents attached to the
complaint are properly considered by the court in determining if
plaintiff has stated a claim upon which relief can be granted.
See Young v. Lepone, 305 F.3d 1, 11 (1st Cir. 2002) (fate of
motion to dismiss generally depends on allegations contained
within four corners of complaint, but may be expanded to include
undisputed information contained within exhibits attached to or
referenced in complaint).

Shepard was a part-time employee at Latva Machine, Inc. ("Latva") starting on January 6, 2007, working under the supervision of Dave Seymour on the second shift until October 6, 2008, when she became a full-time employee.  From October 6 to November 5, 2008, Shepard worked full-time on sandblasting during the first shift, under the supervision of Bob O'Keefe.  From November 5 until November 12, 2008, she worked on the ovens and the deburring feed trays during the first shift.  O'Keefe at that time asked Shepard if she wanted to be trained to operate a "CNC" (computer numerical control) machine, and she said that she did.  From November 12 to November 24, 2008, Shepard received training on two CNC machines and a Dimensional Records program.  (Dimensional records may be used to document the dimensions of machined parts.)  Beginning on November 24, 2008, O'Keefe assigned Shepard to work on the second shift on the CNC machines, initially under Dave Seymour's supervision.  Seymour was terminated on January 9, 2009, and James Buckman replaced him as Shepard's supervisor on the second shift.

Shepard has asserted in the complaint that Latva did not provide her with proper training for her job.  Shepard was put to work full time running a CNC machine and a Dimensional Records program by herself without prior machine experience and

with less than two weeks of training, for a job that her original supervisor, Dave Seymour, said may take three months to learn.  Both Seymour and Ellen Morey, a Latva parts inspector, told the NHHRC investigator that Shepard received inadequate training.

Shepard has asserted that younger employees received more extensive training than she received, in that they were assigned to run machines next to more experienced employees for several months, while she was put to work by herself after less than two weeks of training.  Morey and Seymour told the investigator that they thought that Latva provided poor training to all of its new employees, not just to Shepard.

Shepard also claims that she was harassed and subjected to harsh discipline by her supervisors because of her age.  Her first shift supervisor, Bob O'Keefe, told Shepard's CNC machine trainer, Corey Dupont, that Shepard looked like a deer in the headlights and did not know what she was doing while she was running the CNC machines.  On the last day of Shepard's training, November 24, 2008, O'Keefe told Shepard that he did not care what she knew, she was being returned to the second shift to run the machines by herself.

James Buckman, Shepard's immediate supervisor after
Seymour's termination on January 9, 2009, frequently made
comments to Shepard, and to others at Latva, asserting that
Shepard was unable to learn new information quickly and did her
work poorly because of her age.  Morey shared an office with
Buckman and heard him make multiple comments about Shepard being
too old to learn the job, and that Buckman was sure Shepard
wasn't going to make it.  Morey and Seymour each told the
investigator that Shepard's performance was adequate, that she
produced a sufficient number of parts, and that she did not
generate an excessive amount of scrap.

On March 4, 2009, Buckman told Shepard that she was too old
to learn how to use the CNC machines, that it takes longer to
learn when you are older, that Shepard could not even remember
what Buckman had told her an hour ago, and that she should have
learned how to run the machines in high school.  Buckman
explained to the investigator that he thought recent high school
graduates would have an easier time learning because information
about fractions, decimals, and conversions would be fresh in
their minds.  Buckman admitted to the investigator that he had
made comments to others at Latva about Shepard's age and
inability to remember his instructions, although he denied

telling Shepard directly that she could not remember what he told her an hour ago, as he would not have said anything to her that would embarrass her or hurt her feelings.

Several days later, on March 6 or 8, 2009, Shepard ruined a drill on the machine she was operating by herself. She told a co-worker, Kyle Burns, about ruining the first drill when she went to the tool crib to get a replacement. Shepard replaced the drill herself without telling a supervisor about ruining it. Replacing the drill threw the CNC machine out of alignment and caused it to make excess scrap.

Shepard noticed that the machine was making excess scrap and told Buckman that her machine was not working. Shepard did not tell Buckman about having replaced the drill, because she did not know that it was company protocol to do so, and she did not know that a machine with a replaced drill would make excess scrap. She attributes her lack of knowledge of those issues to her deficient training.

Buckman, not knowing about the replaced drill, assigned Shepard to a new machine while he tried to fix the problem with the old machine. Shepard began working on the new CNC machine, but forgot to turn on the coolant injector and ruined another drill. Shepard told Buckman about ruining that drill, and

Buckman learned from Kyle Burns when he went to the tool crib to replace Shepard's drill that Shepard had already ruined one drill that day.

Buckman called Shepard into his office on March 9, 2009, and gave her a written warning.  The warning stated the following:

> You have had extensive training on the Gas Hole
> Bushings (OP 30) and continue to have problems with
> excessive scrap, rework and tooling expenses, plus
> loss [sic] productive time.  You also have had
> extensive training on Dimensional Records and still
> have a problem with them.  On 3-6-09 through
> carelessness you burned up (2) insert drills.  The 1st
> one you did not even tell me about.  This 1st burned
> up drill caused the fixture to move and from that
> point on, every part you machined was scrap.  Because
> of these serious issues you will not be allowed to run
> anymore CNC for LATVA Machine Co.

Ex. C to Compl. at 4 (doc. no. 1-1, at 10).  Shepard wrote on the warning that she had only received one and a half weeks of training on the CNC machine and on Dimensional Records before being put on the machine by herself.  Shepard asserts that she did not receive any verbal warning of poor job performance before she received this written warning.

When Buckman gave Shepard the written warning, he told her that he did not know what job she would be able to do.  He suggested she might be able to do sandblasting (which she had previously done), but stated that he was not sure.  Shepard

understood Buckman to mean that he believed there was no job she
could do right.  Shepard quit work that day because she believed
that, because of Buckman's disparaging comments about her age
and abilities, he thought there was no job she could do
properly, and no job would be found for her at Latva.

The investigator's report describes Latva's disciplinary
policy as stating that disciplinary action may include verbal
warnings, written warnings, suspension, and/or termination
without notice or warning.  "Unsatisfactory job performance" and
"failing to report to your supervisor any damage immediately"
are listed in the policy as grounds for disciplinary action up
to and including termination.

Prior to Shepard's last day of work, the company's
discrimination policy prohibited age discrimination, but did not
set forth an internal complaint procedure for such claims.  The
company's harassment policy prohibited certain types of
harassment, but did not specifically prohibit harassment on the
basis of age.  The harassment policy directed employees to
contact the company's human resources department or a supervisor
to complain about harassment.

On March 10, 2009, Shepard called the NHHRC to complain
about age-related discrimination at Latva, and was told to write

a letter to the company and to send a copy to the NHHRC.  Three days later, on March 13, 2009, Shepard mailed an age discrimination and harassment complaint to the company's human resources director.  The company investigated the complaint by interviewing a number of employees but did not interview Shepard.  In a letter dated April 13, 2009, the company notified Shepard that it had determined she had not been harassed or discriminated against on the basis of age.

Shepard filed a claim of age discrimination with the NHHRC. The NHHRC investigated Shepard's complaint and made a finding of "no probable cause" on the claims asserting violations of state and federal laws against age discrimination.

The NHHRC letter sent to Shepard and Latva, dated August 30, 2010, which reported the "no probable cause" finding, also included a copy of the NHHRC investigator's report.  The report summarizes the NHHRC administrative record of the evidence obtained during the investigation of Shepard's complaint.  The NHHRC investigator found that Shepard's immediate supervisor had made ageist and discriminatory remarks, and that the company's anti-discrimination and harassment policies did not comply with federal and state laws.  The NHHRC investigator noted that Latva's failure to interview Shepard after she made a complaint

of age discrimination to the company was a significant deficiency in the company's investigation procedures.  The NHHRC directed Latva to provide the NHHRC with a copy of revised anti-discrimination and harassment policies by November 1, 2010, and strongly recommended that the company train its employees, including the individual who had been Shepard's supervisor, regarding anti-discrimination laws, and revise its internal complaint reporting and investigation protocols. Notwithstanding those specific findings, orders, and recommendations, the NHHRC concluded, based on the record before it, that Shepard had not shown that she was constructively discharged or that she had been disciplined as a result of a discriminatory animus held by her supervisor.

After receiving the "no probable cause" letter from the NHHRC, Shepard sought Equal Employment Opportunity Commission ("EEOC") review of her complaint.  In a letter to Shepard dated November 15, 2010, the EEOC notified Shepard that it had adopted the August 2010 findings of the NHHRC, and provided Shepard with a notice of her right to sue Latva.

Thereafter, Shepard received a copy of a letter, dated December 10, 2010, from the NHHRC to Latva, notifying the company that the NHHRC had not received from the company any

revised policies for addressing discrimination and harassment. That letter threatened further agency action against the company if it did not comply with the August 2010 order to revise its policies.

In this lawsuit, Shepard asserts the following claims[2]:

> 1.   Latva violated Shepard's rights under the ADEA (1) by failing to train her properly, and (2) by subjecting her to criticism and discipline that was, because of her age, harsher than it would otherwise have been.

> 2.   Latva is liable to her under the ADEA because her supervisor made disparaging age-based comments about her ability to learn and to perform her job, and issued her a written warning, which caused her to suffer a constructive discharge.

## Discussion

### I.   Right to Sue

A plaintiff claiming that an employer violated the ADEA must first pursue the claim administratively through the EEOC and then file suit within 90 days of receipt of the notice of the EEOC decision, if he or she is unhappy with that decision. 29 U.S.C. § 626(d).  Here, Shepard has alleged facts sufficient to show that she pursued an administrative claim through the

---

[2]The claims identified herein shall constitute the claims asserted in this action.  If Shepard disagrees with this identification of the claims, she must file a timely objection to this Report and Recommendation or properly move to amend the complaint.

EEOC, obtained a right to sue letter, and filed suit within the 90-day time limit.

II.  ADEA

A.   Elements

The ADEA provides that "[i]t shall be unlawful for an employer to . . . discharge any individual or otherwise discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment because of such individual's age."  29 U.S.C. § 623(a)(1). Liability for disparate treatment hinges on whether age actually motivated the employer's decision.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000).  "To state a claim under the ADEA, a plaintiff must establish that he or she suffered an adverse employment action that was motivated by age, and suffered an injury as a result.  See Collazo v. Nicholson, 535 F.3d 41, 44 (1st Cir. 2008).

To prove her claim, a plaintiff lacking direct evidence of a discriminatory motive may rely on the evidentiary presumptions generated through the burden-shifting framework enunciated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under that framework, a presumption of age-based discrimination is

bestowed upon a plaintiff who establishes a prima facie case by
showing (1) that she was over forty, (2) that she performed her
job adequately, (3) that she suffered an adverse employment
action, and (4) that age was not treated neutrally.  See
generally Velez v. Thermo King de P.R., Inc., 585 F.3d 441, 446-
48 (1st Cir. 2009) (describing burden-shifting framework that
applies in ADEA cases).

At that point, the burden of production shifts; the
defendant must thereafter articulate a non-discriminatory reason
for the employment action.  See id.  To counter that showing,
plaintiff must then demonstrate that the articulated non-
discriminatory reason for the employment action was a pretext
for discrimination.  See id.  "Ultimately, the plaintiff's
burden is to prove 'that age was the 'but-for' cause of the
employer's adverse action.'"  Id. at 448 (quoting Gross v. FBL
Fin. Servs., Inc., ___ U.S. ___, ___, 129 S. Ct. 2343, 2351
(2009)).

For the purposes of surviving a preliminary review of the
sufficiency of the claims, however, a plaintiff need not plead
every element of a prima facie case.  See Swierkiewicz v. Sorema
N.A., 534 U.S. 506, 515 (2002); Rodriguez-Lizardi v. Radio Shack
Corp., Civ. No. 09-1724(JP), 2010 WL 2838613, *3 (D.P.R. July

19, 2010) ("plaintiff alleging an ADEA claim is not required to
establish a full prima facie case" in order to state viable ADEA
claim).  An ADEA plaintiff must, however, allege sufficient,
non-conclusory facts to state a plausible claim for relief.  See
Rodriguez-Lizardi, 2010 WL 2838613, at *3 (citing Twombly, 550
U.S. at 570).

Here, Shepard has shown that she was over forty during the
relevant time period, and she has pleaded facts indicating that
she was generally performing her job adequately, if not at all
times perfectly.  She has claimed that she suffered three types
of adverse employment actions which she alleges were the result
of age discrimination:  (1) insufficient job training; (2) harsh
discipline; and (3) age-discriminatory disciplinary action and
age-based criticism that caused her to quit under circumstances
that were tantamount to a constructive discharge.

Not every bad evaluation or disciplinary action taken by an
employer constitutes an adverse employment action.  "'Workplaces
are rarely idyllic retreats, and the mere fact that an employee
is displeased by an employer's act or omission does not elevate
that act or omission to the level of a materially adverse
employment action.  Typically the employer must . . . take
something of consequence from the employee, say, by discharging

or demoting her, reducing her salary, or divesting her of significant responsibilities' or 'withhold an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service.'"  Horney v. Westfield Gage Co., 77 F. App'x 24, 32-33 (1st Cir. 2003) (quoting Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996)).

    B.   Discriminatory Training

A discriminatory training practice that either leads to poor job performance which results in an employee's dismissal, or that is materially related to an employee's job responsibilities, may be actionable under the ADEA.  See Schreiber v. Worldco, LLC, 324 F. Supp. 2d 512, 522 (S.D.N.Y. 2004) (discriminatory denial of training that resulted in plaintiffs' poor performance and ultimately led to their dismissal was actionable under ADEA); see also Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1435-36 n.16 (11th Cir. 1998) ("Discrimination with respect to training programs is . . . actionable under the ADEA, as long as the training is materially related to the employee's job responsibilities or possibilities for advancement." (citation omitted)).

Here, Shepard has alleged that younger employees received supplemental training on the job that she did not receive.  She has also alleged that her deficient training and lack of supplemental training resulted in her ruining drills in March 2009 and failing to inform Buckman immediately, which led to the warning and Buckman's decision that she be precluded from operating CNC machines in the future.  It is reasonable to infer from the facts alleged, when viewed in a light most favorable to Shepard, that inadequate training caused Shepard to perform poorly on one day in March 2009, which led her employer to divest her of significant responsibilities, namely, the opportunity to operate CNC machines.  The age-based animus for this inadequate training rests on inferences drawn in Shepard's favor from her alleging that younger employees were trained for up to three months longer than she was trained, and her showing that Sharon Dunham, a younger employee, received on the job training for several days when she started working on the second shift by herself, which Shepard denies having received.  The court finds that the allegations in the complaint are minimally adequate to render Shepard's claim of discriminatory training

plausible.  For that reason, in the Order issued this date
service of the claim is directed on the defendant.[3]


    B.   <u>Discriminatory Discipline</u>

Discriminatory discipline can be actionable under the ADEA,
if it can be said to constitute a "materially adverse employment
action."  <u>Horney</u>, 77 F. App'x at 32-33 ("materially adverse
employment action" may include employer's "'taking something of
consequence from the employee, say, by discharging or demoting
her, reducing her salary, or divesting her of significant
responsibilities'" (citation omitted)).  Here, Shepard has
alleged -- without identifying any similarly-situated younger
person, and without describing any particular discipline imposed
on such a younger person -- that younger persons in general
received different discipline than she received, which the court
reasonably infers to mean less severe consequences under similar
circumstances.

---

    [3]While the court finds that Shepard's allegations are
sufficient to allow this action to progress beyond preliminary
review, Shepard may face difficulties, at later stages of the
proceeding, in surmounting certain facts in the record, such as
Morey and Seymour telling the NHHRC investigator that Latva
provides poor training to everyone, and Dunham's description of
a training regimen that was not months longer than Shepard's.

Shepard has also shown that Buckman, the supervisor who issued the written warning to her, frequently -- and recently -- remarked that he considered Shepard's age to be the reason for her poor performance and forgetfulness, and he also predicted that she would not make it.  Those remarks suggest that Buckman harbored an age-based animus and may be relevant to show pretext, if the claim is otherwise viable.  See generally McMillan v. Mass. SPCA, 140 F.3d 288, 301 (1st Cir. 1998) (stray remarks made by decisionmaker not directly related to disputed employment action may be relevant to question of whether employer's stated reason for employment action was pretextual for age discrimination).

Shepard has also shown that the written warning she received precluded her from operating the CNC machines at Latva. It may reasonably be inferred from the facts alleged in the complaint, when viewed in a light most favorable to Shepard, that the disciplinary action divested her of significant job responsibilities at Latva, such that it constituted an adverse employment action.

Taking all of the allegations as true and construing all reasonable inferences in Shepard's favor, the court finds that Shepard's allegations are sufficient at this stage to state a

plausible claim of discriminatory discipline, violating her rights under the ADEA.[4]   Therefore, in the Order issued this date, the court has directed service of this claim on defendant.

###### C.   Constructive Discharge

"To prove constructive discharge, a plaintiff must usually show that her working conditions were so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign."  Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 50 (1st Cir. 2008) (internal quotation marks and citation omitted).

> In such cases, the question is not whether working conditions at the facility were difficult or unpleasant, but rather, an employee must show that, at the time of his resignation, his employer did not allow him the opportunity to make a free choice regarding his employment relationship.  Thus, in order for resignation to constitute a constructive discharge, it effectively must be void of choice or free will.

---

[4] Shepard may ultimately find it difficult to prove that age was the but-for cause of the discipline she received, given the notes in the investigator's report concerning the circumstances leading up to the issuance of the written warning and the terms of Latva's disciplinary policy.  See Ex. C to Compl. at 5 (doc. no. 1-1 at 11-12) (reasons for disciplinary action up to and including immediate termination include "unsatisfactory job performance" and "failing to report to your supervisor any equipment damage").  At this stage of the proceeding, however, the court finds that plaintiff has alleged sufficient facts to state a plausible claim for relief under the ADEA.

Id. (internal quotation marks, alterations, and citations
omitted).

Here, Shepard has alleged that she was subjected to
O'Keefe's criticism of her, and Buckman's frequent, ageist
remarks.  She has also shown that she received a written warning
from Buckman, and that she construed his remarks about saying
that he was not sure if she could do sandblasting - a job she
had done before - as indicating that no job would be found for
her.  Whether an employee subjectively believes she will be
fired, however, is not the relevant standard for determining
whether the facts show a constructive discharge.  The facts
alleged in the complaint, including the written warning, her
supervisors' comments about her performance on the CNC machines,
and Buckman's uncertainty about the availability of a
sandblasting position do not amount to circumstances that would
cause a reasonable employee in Shepard's shoes to feel compelled
to quit.  Buckman's expression of uncertainty about any
particular placement was not tantamount to an expression of
doubt as to whether Shepard could be employed there at all.
While the court has no reason to doubt Shepard's assertions
regarding her subjective perception of her situation, the facts
alleged do not support a finding that she was constructively

discharged.  Accordingly, the court should dismiss the ADEA
claim based on a constructive discharge.

## Conclusion

For the foregoing reasons, the court should dismiss the
constructive discharge claim.  The remaining ADEA claims
identified above are sufficiently stated to allow them to
proceed, and in a separate Order issued this date, the court has
directed service of those claims.

Any objections to this report and recommendation must be
filed within fourteen (14) days of receipt of this notice.  See
Fed. R. Civ. P. 72(b)(2).  Failure to file objections within the
specified time waives the right to appeal the district court's
order.  See Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d
554, 564 (1st Cir. 2010); United States v. Lugo Guerrero, 524
F.3d 5, 14 (1st Cir. 2008).

_____
Landya McCafferty
United States Magistrate Judge

September 19, 2011

cc:  Barbara Shepard, pro se

LBM:nmd

23